IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES | ) | |
| | ) | No. 25 CR 566 |
| v. | ) | |
| | ) | Judge Jeffrey Cummings |
| DAKANE MASTERS | ) | |

**DEFENDANT MASTERS' MOTION TO DISMISS INDICTMENT
ON SECOND AMENDMENT GROUNDS**

Defendant DAKANE MASTERS, by his attorney Daniel Hesler of the Federal

Defender Program, submits this motion to dismiss the indictment on Second Amendment

grounds. The indictment charges Mr. Masters with being a felon in possession of a

firearm in violation of 18 U.S.C. § 922(g)(1). Both facially and as applied to Mr. Masters,

§ 922(g)(1) is unconstitutional, and therefore this indictment should be dismissed.

Defendant further states as follows:

**BACKGROUND**

On December 9, 2024, Dakane Masters was arrested for the conduct that underlies

this case. After that state arrest, he was not released on bond. On September 12, 2025,

Mr. Masters was indicted federally on one count of possessing a firearm as a felon in

violation of 18 U.S.C. § 922(g)(1). Mr. Masters was first writted into federal custody on

October 8, 2025. He was arraigned on that date and returned to state custody because he

hoped to finish a course he was taking in IDOC. On December 3, 2025, he was re-writted

into federal custody, where he remains.

1

At the time of his arrest on December 9, 2024, Mr. Masters was on bond. After his December 9, 2024 arrest (*i.e.,* this case) that bond was revoked. Mr. Masters is currently serving the sentence from his 2023 case. His projected parole date from IDOC is November 9, 2028.

According to records available to the defense, Mr. Masters may have the following adult convictions:[1]

| Arrest Date | Charge | Disposition |
|---|---|---|
| 5/28/2013 (Age 17) | Residential Burglary 720 ILCS 5/19-3(A) Cook County, IL 13 CR 1233802 | Pled guilty on 12/17/2013 Sentenced to 4 years IDOC (with a boot camp recommendation) |
| 8/29/2015 (Age 20) | Aggravated UUW 720 ILCS 5/24-1.6(A)(1) Cook County, IL 15 CR 1548601 | Pled guilty on 9/26/2016 Sentenced to 3 years IDOC (*but see People v. Burns*, 79 N.E. 3d 159 (Ill. Sup. Ct. 2015) (finding 720 ILCS 5/24-1.6(A)(1) unconstitutional)) |
| 3/14/2018 (Age 22) | Felon in possession 720 ILCS 5/24-1.1(A) Cook County, IL 18 CR 511501 | Pled guilty on 6/18/2019 Sentenced to 5 years IDOC |
| 8/13/2020 (Age 25) | Felon in Possession 720 ILCS 5/24-1.1 Maclean County, IL 20 CF 809 | Pled guilty on 5/3/2022 Sentenced to 7 years IDOC |
| 11/22/2023 (Age 28) | Armed habitual criminal 720 ILCS 5/24-1.7(a) Cook County, IL 23 CR 1261201 | Pled guilty on 6/25/2025 Sentenced to 6 years IDOC 11/9/28: projected parole date |

Although Mr. Masters has five felony convictions, none are for drug distribution or crimes of violence. His only conviction for anything that would have been considered

---

[1] All representations concerning Mr. Masters' record are based on counsel's reading of records received so far. This could be less than perfectly accurate.

a crime in the 1700's was his 2013 conviction for residential burglary, which was based on conduct that occurred before Mr. Masters turned 18.[2] At the time of the currently charged offense, it appears Mr. Masters was on bond, and had been on bond for 16 months prior to his arrest on December 9, 2024.

Mr. Masters is now charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). He now moves to dismiss the indictment on the grounds that § 922(g)(1) is generally unconstitutional under the second amendment, as well as the grounds that that statute is unconstitutional as applied to him in particular.

## ARGUMENT

In *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 17 (2022), the Supreme Court held that when the "Second Amendment's plain text covers an individual's conduct," to justify a regulation of that conduct the government "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." Caselaw is developing concerning how *Bruen* applies to various gun regulations, including § 922(g)(1). *See, e.g., Atkinson v. Garland*, 70 F.4th 1018 (7th Cir. 2023); *United States v. Gay*, 98 F.4th 843 (7th Cir. 2024); *United States v. Rahimi*, 602 U.S. 680 (2024). *United States v. Prince*, 700 F.Supp. 3d 663 (N.D. Ill. 2023), may be of particular significance. It addresses the constitutionality of 18 U.S.C. § 922(g)

---

[2] The Illinois offense of residential burglary is not considered a crime of violence in the Seventh Circuit. *See United States v. Nebinger*, 987 F.3d 734, 742 (7th Cir. 2021) (citing *United States v. Glispie*, 978 F.3d 502, 503 (7th Cir. 2020)).

specifically. This case is currently on appeal and was argued before the Seventh Circuit on December 11, 2024, with a decision still pending. *See* Seventh Cir. Case No. 23-3155.

On April 12, 2024, the Seventh Circuit, in *United States v. Gay*, 98 F.4th 843, 846–47 (7th Cir. 2024), held that only "law-abiding, responsible citizens" enjoy the rights afforded by the Second Amendment. This decision interpreted *Heller* as binding, thereby holding that "prohibitions on the possession of firearms by felons" are valid. *See District of Columbia v. Heller*, 554 U.S. 570, 626–27 (2008). However, on June 21, 2024, the Supreme Court clarified *Heller,* stating that the Second Amendment does not prohibit the enactment of gun regulations on "categories of persons thought by a legislature to present a special danger of misuse." *Rahimi*, 602 U.S. at 698. Therefore, under *Bruen* and *Rahimi*, § 922(g)(1) is unconstitutional facially and as applied to Mr. Masters, notwithstanding *Gay*, as *Gay* does not survive *Rahimi*.

## I.     Relevant Legal Background in the Supreme Court and Seventh Circuit.

### A.     *Bruen*'s Second Amendment test and the Seventh Circuit's subsequent decision in *Gay*

In *Bruen*, the Supreme Court rejected the "intermediate scrutiny" framework that the Seventh Circuit and other appellate courts previously applied to Second Amendment challenges. 597 U.S. at 19 (rejecting the two-step test set out in *Kanter v. Barr*, 919 F.3d 437, 441 (7th Cir. 2019) because it "involved one step too many"). In its place, the *Bruen* Court explained that

> the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must

4

then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id*. at 24 (quoting *Konigsberg v. State Bar of Cal*., 366 U.S. 36, 51 n.10 (1961)). Given this holding, numerous challenges to the subsections of 18 U.S.C. §922 have followed nationwide.

Subsequently, the Seventh Circuit held in *Gay* that the defendant, a felon, did not have a constitutional right to possess firearms at the first step of the *Bruen* analysis. 98 F.4th at 847. The court stated that *Gay's* argument was "hard to square" with *Heller's* language that that opinion should not be read "to cast doubt on longstanding prohibitions on the possession of firearms by felons[.]" *Id*. at 846; *Heller*, 554 U.S. at 626. The court assumed that there is "*some* room for as-applied challenges" to § 922(g)(1) but found that *Gay* was "not a 'law-abiding, responsible' person who has a constitutional right to possess firearms" due to his 22 felony convictions and status as a parolee. *Gay*, 98 F.4th at 846–47. Thus, *Gay's* challenge to § 922(g)(1) failed. *Id*.

Courts in this district have interpreted *Gay* in various ways. *See, e.g., United States v. Evans*, No. 24-CR-298, 2026 WL 92872, at *2 (N.D. Ill. Jan. 13, 2026) (Blakey, J.) ("Binding precedent forecloses any facial invalidation of § 922(g)(1) under the Second Amendment."); *United States v. Gutierrez*, No. 1:22-CR-00329, 2024 WL 4041321, at *12–13 (N.D. Ill. Sept. 4, 2024) (Chang, J.) (acknowledges that *Gay* leaves some room for as-applied challenges but rejecting the facial challenge as defendant is a parolee lacking the same armament rights as a free person by promising as part of parole to not

5

possess a firearm); *United States v. Mintz*, No. 22-cr-00438, 2024 WL 3177910, at \*2 (N.D. Ill. June 26, 2024) (Coleman, J.) (stating that *Gay* concluded the defendant was "'not a "law-abiding, responsible" person who has a constitutional right to possess firearms' given his criminal history and the fact he violated the statute while on parole."); *United States v. Head*, 734 F.Supp.3d 806, 811 (N.D. Ill. 2024) (Maldonado, J.) (*Gay* "concluded that, given his criminal history and the fact he violated the statute while on parole, Gay was not a 'law-abiding, responsible' person who has a constitutional right to possess firearms[.]"); *United States v. Hurnes*, 735 F.Supp.3d 953, 963–64 n.3 (N.D. Ill. 2024) (Chang, J.) ("*Gay's* direct holding was that parolees have a reduced right to possess firearms").

> **B.      The Supreme Court's decision in *Rahimi* undermines *Gay*.**

In *Rahimi*, decided after the *Gay* opinion was issued, the Supreme Court addressed a narrow challenge to § 922(g)(8)(C)(i), which prohibits an individual subject to a domestic violence restraining order from possessing a firearm if the restraining order includes a finding that the person is a credible threat to the physical safety of another. 602 U.S. at 690. The Court found § 922(g)(8) constitutional in part because its restriction is "temporary[,]" *id*. at 699, and "applies only once a court has found that the defendant 'represents a credible threat to the physical safety' of another[.]" *Id*. The Court clarified the *Bruen* standard and explained that it was not "meant to suggest a law trapped in amber" and "permits more than just those regulations identical to ones that could be found in 1791." *Id*. at 691. But the government must show the challenged law is

6

"consistent with the principles that underpin our regulatory tradition" and is "relevantly similar to laws that our tradition is understood to permit[.]" *Id*. at 692.

The Court also emphasized that "[w]hy and how the regulation burdens the right are central to this inquiry." *Id*. The "why" goes to a law's purpose in achieving a regulatory goal. *Id*.; *Bruen*, 597 U.S. at 29. And the "how" goes to the weight of the law's burden. That burden includes the kind of showing needed to trigger disarmament, the temporary nature of that disarmament, and the consequences that flow from it. *Rahimi*, 602 U.S. at 698–99. A modern law must meet both prongs of the test. *Id*.; *see also Bruen*, 597 U.S. at 29. A law that has a distinct purpose is unconstitutional even if its burden is minor. *Id*. So too is one that applies "for a permissible reason … [but] does so to an extent beyond what was done at the founding." *Rahimi*, 602 U.S. at 692.

The Court also clarified that the government must meet its burden with a properly supported historical justification, rather than abstract principles. This historical tradition is primarily discerned through historical regulation itself—a law must be "'relevantly similar' to laws that our tradition is understood to permit." *Id*.

Importantly, the Court rejected the government's argument that the Second Amendment's plain text only protects "law-abiding, responsible citizens." *See* Brief for the United States at 11–12, *United States v. Rahimi*, 602 U.S. 680, No. 22-915 (U.S. Aug. 14, 2023). Thus, Mr. Rahimi could not "be disarmed simply because he is not 'responsible.'" The Court explained this as follows:

> Finally, in holding that Section 922(g)(8) is constitutional as applied to Rahimi, we reject the Government's contention that Rahimi may be disarmed simply because he is not "responsible." "Responsible" is a vague term. It is unclear

7

what such a rule would entail. Nor does such a line derive from our case law. In *Heller* and *Bruen*, we used the term "responsible" to describe the class of ordinary citizens who undoubtedly enjoy the Second Amendment right. But those decisions did not define the term and said nothing about the status of citizens who were not "responsible." The question was simply not presented.

*Rahimi*, 602 U.S. at 701–02 (internal citations omitted); *see also id*. at 772–73 (Thomas, J. dissenting) ("[The Government] argues that the Second Amendment allows Congress to disarm anyone who is not 'responsible' and 'law-abiding.' Not a single Member of the Court adopts the Government's theory … The Government's argument lacks any basis in our precedents[.]").

In so holding*, Rahimi* thus completely undermined *Gay's* contention that a person with a certain number of felony convictions or on parole is not "responsible" and lacks Second Amendment rights. Subsequently, in *United States v. Seiwert*, 152 F.4th 854, 862 (7th Cir. 2025), the Seventh Circuit acknowledged that "in *Rahimi*, the Supreme Court eyed [the government's argument limiting 'the people'] with much skepticism… and rebuffed the government's reading of *Bruen* and *Heller*." (internal citations omitted). *See also United States v. Davis*, No. 25-1602, 2026 WL 114689, at \*2 (7th Cir. 2026) ("no appellate decision, before or after *Bruen* and *Rahimi,* holds that the Second Amendment prevents temporarily disarming convicted drug offenders"). As a result, *Gay* does not survive *Rahimi*.

## C. The Current Circuit Split

In the wake of *Rahimi*, numerous circuit courts have considered facial and as-applied challenges to § 922(g)(1). Thus far, the Seventh Circuit has yet to definitively

8

resolve a facial or an as-applied challenge post-*Bruen*. As noted above, however, it assumed that there is some room for an as-applied challenge given the language in *Gay* and the pending decision in *Prince*, 700 F.Supp.3d, which advanced a facial challenge. The Third Circuit has held that § 922(g)(1) is unconstitutional as applied to a felon who was convicted of making a false statement to secure food stamps. *See Range v. Att'y Gen.*, 124 F.4th 218, 222–23 (3d Cir. 2024) (en banc). Two circuits have rejected individual as-applied challenges but have left open the possibility that § 922(g)(1) might be unconstitutional as applied to at least some felons. *See United States v. Diaz*, 116 F.4th 458, 471 (5th Cir. 2024) (rejecting an as-applied challenge because the defendant's underlying felony was sufficiently similar to a death-eligible felony at the founding); *United States v. Williams*, 113 F.4th 637, 661–62 (6th Cir. 2024) (rejecting an as-applied challenge because the defendant's criminal record sufficiently showed that he was dangerous enough to warrant disarmament). Six circuits have upheld the categorical application of § 922(g)(1) to all felons. *See Zherka v. Bondi*, 140 F.4th 68, 96 (2d Cir. 2025); *United States v. Hunt*, 123 F.4th 697, 707–08 (4th Cir. 2024); *United States v. Jackson*, 110 F.4th 1120, 1129 (8th Cir. 2024); *United States v. Duarte*, 137 F.4th 743, 748 (9th Cir. 2025); *Vincent v. Bondi*, 127 F.4th 1263, 1265–66 (10th Cir. 2025); *United States v. Dubois,* 139 F.4th 887, 893 (11th Cir. 2025).

9

II. **The plain text of the Second Amendment applies to Mr. Masters' conduct and protects Mr. Masters' right to bear arms.**

A. **Facial and as-applied challenges**

Mr. Masters contends that § 922(g)(1) is unconstitutional facially because there is no historical tradition of disarming all felons, and as applied to him individually because his felony convictions do not show that he is a current danger to such an extent that our regulatory tradition would have permitted the government to permanently disarm him.

"[T]he distinction between facial and as-applied challenges is not so well defined" but it affects "the breadth of the remedy employed by the Court[.]" *Citizens United v. Federal Election Com'n*, 558 U.S. 310, 331 (2010). For an as-applied challenge, the question is whether a law with some permissible uses "is nonetheless unconstitutional as applied to [the defendant's] activity[.]" *Spence v. Washington*, 418 U.S. 405, 414 (1974). "[F]or reasons relating both to the proper functioning of courts and to their efficiency, the lawfulness of the particular application of the law should ordinarily be decided first*." Bd. of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469, 485 (1989).

B. **Mr. Masters is one of "the people" who have protected Second Amendment rights.**

As the Supreme Court has explained, the plain language of the Second Amendment "guarantee[s] the individual right to possess and carry weapons[.]"*Heller*, 554 U.S. at 592. Supreme Court precedent also indicates that individuals who have prior felony convictions are part of "the people" protected by the Second Amendment. *See id*.

10

at 580–81.[3] Specifically, in *Heller*, the Supreme Court held that there is "a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Id*. at 581. And while the *Heller* decision also included dicta emphasizing the Second Amendment's protections for "law-abiding, responsible citizens," *id*. at 635, the Seventh Circuit has rejected the notion that this dicta limits the scope of the Second Amendment, *United States v. Meza-Rodriguez*, 798 F.3d 664, 669 (7th Cir. 2015) and *Seiwert*, 152 F.4th at 862, and the Supreme Court in *Rahimi* similarly rejected it and noted that "[t]he question was simply not presented" in *Heller* or *Bruen*. 602 U.S. at 702.

In *Rahimi*, the Supreme Court clarified that a citizen cannot be "disarmed simply because he is not 'responsible'" because that is a "vague term" and it is "unclear what such a rule would entail." *Id.* At 701; *see also id*. at 713 (Gorsuch, J., concurring) ("Nor do we purport to approve in advance other laws denying firearms on a categorical basis to any group of persons a legislature happens to deem, as the government puts it, 'not

---

[3] *See also Range v. Att'y Gen. United States*, 124 F.4th 218, 228 (3d Cir. 2024*)*; *United States v. Duarte*, 137 F.4th 743, 754–55 (9th Cir. 2025) (same); *United States v. Williams*, 113 F.4th 637 (6th Cir. 2024); *United States v. Diaz*, 116 F.4th 548 (5th Cir. 2024); *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 116 (10th Cir. 2024); *Zherka v. Bondi,* 140 F.4th 68, 76–77 (2d Cir. 2025); *United States v. Calhoun*, 710 F.Supp.3d 575, 587 (N.D. Ill. 2024) (Valderrama, J.) (holding "felons are not categorically excluded from the plain textual scope of the Second Amendment."); *United States v. Gates*, No. 22 CR 00397, 2023 WL 5748362, at *5 (N.D. Ill. Sept. 6, 2023) (Chang, J.); *United States v. Bell*, No. 23 CR 311, 2023 WL 8475814, at *1 (N.D. Ill. Dec. 7, 2023) (Alonso, J.); *United States v. Prince*, 700 F.Supp.3d 663 (N.D. Ill. 2023) (Gettleman, J.); *United States v. Neal*, 715 F.Supp.3d 1084 (N.D. Ill. 2024) (Ellis, J.); *United States v. Johnson*, No. 18 CR 00458, 2023 WL 6690388, at *3 (N.D. Ill. Oct. 12, 2023) (Durkin, J.); *United States v. Washington*, No. 23 CR 00274, 2023 WL 8258654, at *3–4 (N.D. Ill. Nov. 29, 2023) (Coleman, J.); *United States v. Jackson*, 700 F.Supp.3d 651 (N.D. Ill. 2023) (Bucklo, J.); *United States v. Head*, 734 F.Supp.3d 806 (N.D. Ill. 2024) (Maldonado, J.);  but see *United States v. Hardy*, No. 23 CR 129, 2023 WL 6795591, at *3 (N.D. Ill. Oct. 13, 2023) (Kendall, J.).

responsible.'"), at 772–73 (Thomas, J. dissenting) ("[The Government] argues that the Second Amendment allows Congress to disarm anyone who is not 'responsible' and 'law-abiding.' Not a single Member of the Court adopts the Government's theory … The Government's argument lacks any basis in our precedents[.]"). Accordingly, *Rahimi* unanimously rejected the "law-abiding, responsible" citizen rule advanced in *Gay*. *United States v. Gay*, 98 F.4th 843, 846–47 (7th Cir. 2024). *Rahimi* instead confirms that the Second Amendment right "belongs to all Americans." *Heller*, 554 U.S. at 581. Consistent with *Rahimi* and *Seiwert*, this Court should find that the Second Amendment extends to all individuals with prior felony records, and to Mr. Masters individually.

Further, Mr. Masters' bond status at the time of his current arrest does not remove him from "the people" under the Second Amendment. While parolees may have less rights with respect to the Fourth Amendment, *Samson v. California*, 547 U.S. 843, 857 (2006), this legal impediment does not arise out of the Second Amendment or necessarily extend to other constitutional provisions that use the words "the people," like the First Amendment right of "the people" to peaceably assemble. The caselaw is even less clear about people on bond, but Mr. Masters asserts that he is one of "the people" protected by the Second Amendment.

III.     **The government cannot carry its burden to establish that § 922(g)(1), facially or as applied to Mr. Masters, is relevantly similar to any historical regulation.**

The plain text of the Second Amendment covers the conduct criminalized by § 922(g)(1), and thus the government has the burden to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm

regulation." *Bruen*, 597 U.S. at 24. Specifically, the government must show that § 922(g)(1) is "'relevantly similar' to laws that our tradition is understood to permit," particularly that the "[w]hy and how the regulation burdens the right" are relevantly similar to historical regulations. *Rahimi*, 602 U.S. at 692.

### A. The historical evidence does not show a tradition of disarming all felons.

To prevail, the government must "satisfy the demanding standard set forth in *Bruen*." *Atkinson*, 70 F.4th at 1022. The government will be unable to meet this burden because there is no evidence of any laws restricting felons from gun ownership at the time of the Founding or ratification of the Second or Fourteenth Amendments.

In the early American republic, there were no laws that prohibited non-violent ex-felons from possessing firearms after they had completed their punishment. *See* Conrad Kahn, *Challenging the Federal Prohibition on Gun Possession by Nonviolent Felons*, 55 S. TEX. L. REV. 113, 127 (2013) ("the federal felon-firearm prohibition only dates back to 1938 … evidence exists that during the founding era felons were not precluded from firearm possession."); *Kanter*, 919 F.3d at 454 (Barrett, J., dissenting) ("The best historical support for a legislative power to permanently dispossess all felons would be founding-era laws explicitly imposing … such a ban. But at least thus far, scholars have not been able to identify any such laws."); *Folajtar v. Attorney General of the United States*, 980 F.3d 897, 915 (3d Cir. 2020) (Bibas, J., dissenting) ("I cannot find, and the majority does not cite, any case or statute from that era that imposed … such bans."). Additionally, a lifetime ban on firearm possession was not passed by Congress until

1961, well after the Founding and ratification of both the Second and Fourteenth Amendment. *Prince*, 700 F. Supp. 3d at 669 (citing to Pub. L. 87-342, 75 Stat. 757 (1961)).

In *Bruen*, the Supreme Court held that "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 597 U.S. at 26. And *Rahimi* reaffirmed *Bruen's* "commonplace" analogical reasoning. 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 28). That is the situation here. Crime and recidivism are general societal problems that have existed throughout history. But, historically American society did not traditionally respond to these problems by barring all felons from possessing guns. The Seventh Circuit has also held, prior to *Atkinson*, that "the historical evidence is inconclusive as to whether felons were categorically excluded from the Second Amendment's scope." *Kanter*, 919 F.3d at 445 (capitalization altered). The evidence is inconclusive at best, which does not meet the standard set forth in *Bruen*. *See* 597 U.S. at 18.

> **B.      The laws that the government commonly cites as analogous to § 922(g)(1) are not relevantly similar to § 922(g)(1).**

Next, the government cannot show that § 922(g)(1), facially, is consistent with "the principles that underpin our regulatory tradition" because the laws that are commonly cited are not relevantly similar to § 922(g)(1). *Rahimi*, 602 U.S. at 692.

Specifically, the "[w]hy and how [§ 922(g)(1)] burdens the right" is not relevantly similar to the laws commonly cited. *Id*.

The laws commonly cited by the government in support of felon in possession restrictions simply did not impose a comparable burden on Second Amendment rights. English laws disarming Catholics did not "impose a comparable burden on the right of armed self-defense" because, among other things, the laws contained a self-defense exception. *See* Joseph G.S. Greenlee, The *Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 WYO. L. REV. 249, 263 (2020). As to colonial-era laws disarming Native Americans and enslaved people, "[n]either the Indian nor the slave was a citizen of the British colonies and … neither was entitled to the rights of English subjects." *United States v. Jimenez Shilon*, 34 F.4th 1042, 1047 (11th Cir. 2022). Further, these laws contained certain exceptions and largely didn't constitute outright bans. For example, masters could permit enslaved people to possess firearms. *Prince*, 700 F.Supp.3d. at 671. As for Native Americans, only one Rhode Island law constituted an outright ban, while the typical state laws prevented the *sale* of firearms to Native Americans rather than prohibiting possession. *Id.*

The ratifying conventions of Massachusetts, Pennsylvania, and New Hampshire never became law, were not incorporated into the Second Amendment, and were not concerned with people with felony records but instead "threatened violence and the risk of public injury." *Kanter*, 919 F.3d at 456 (Barrett, J., dissenting). And the laws imposing capital punishment and "civil death" on felons had already become relatively rare by the time the constitution was ratified. *Id*. at 459. Then-Judge Barrett exhaustively reviewed

historical sources and concluded that "[f]elons serving a term of years did not suffer civil death … Those who ratified the Second Amendment would not have assumed that a free man, previously convicted, lived in a society without any rights and without the protection of law." *Id*. at 461.

None of these sources of historical evidence is sufficiently probative to show a longstanding historical tradition of disarming all felons for their natural life, much less, as explained below, a longstanding historical tradition of disarming felons, like Mr. Masters specifically, who have never sustained a felony conviction for a crime of violence. *See Bruen*, 597 U.S. at 18; *Rahimi*, 620 U.S. at 692–93.

Instead the historical record tends to show efforts to temporarily disarm violent individuals, as explained in *Rahimi*, 620 U.S. Further, the "[w]hy and how" of § 922(g)(8), the challenged provision in *Rahimi*, is markedly different from that of §922(g)(1). In *Rahimi*, the Supreme Court explained that § 922(g)(8) was constitutional in part because it imposed only temporary disarmament, similar to the historical analogues cited by the government (surety and going armed laws). 602 U.S. at 699. The Supreme Court also relied on the fact that § 922(g)(8)'s restriction "applies only once a court has found that the defendant 'represents a credible threat to the physical safety' of another[.]" *Id*. In other words, a judicial finding that the person represents a current threat to another individual was a necessary piece of the Court's willingness to uphold § 922(g)(8). In contrast, § 922(g)(1)'s restriction is permanent and applies due to the simple fact of any felony conviction. Section 922(g)(1)'s permanent disarmament without a contemporary adjudication is distinct and applies "to an extent beyond what was done

16

at the founding," *id*. at 692, and therefore its burden – the "how" described by *Bruen* and *Rahimi* –is not comparable.

**C.    The government cannot meet its burden to show its purported analogues justify the permanent disarmament of Mr. Masters specifically.**

In determining whether § 922(g)(1) is unconstitutional as it applies to certain categories of offenders, as an initial matter, *Bruen* assigns the historical burden to the government, not to the defendant. 597 U.S. at 19 (government is required to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms"). In the context of an as-applied challenge, this means that the government must demonstrate that its historical analogies are relevant even to defendants with a record like Mr. Masters'.

The government cannot carry their burden with respect to Mr. Masters. First, colonial era disarmament laws were not about "untrustworthiness" or "danger," but instead targeted minority groups that were politically subjugated or excluded from the rights of citizenship. At most, these laws targeting minority groups were about lessening the specific risk of armed rebellion. Colonial laws prevented enslaved individuals from accessing guns because white colonists feared revolts from the enslaved. *See* HERBERT APTHEKER, AMERICAN NEGRO SLAVE REVOLTS 18–19 (5th ed. 1987) (citing the "nearly unanimous agreement" among scholars that there was "widespread fear of servile rebellion" throughout the 18th century (footnote omitted)). Laws disarming Native Americans, Catholics, and British loyalists were similarly motivated by colonial fears of insurrection. *See, e.g., Prince*, 700 F.Supp.3d at 671 n.4 (noting that "members of the

Native American tribes were considered to be citizens of hostile foreign nations"); Clement Fatovic, *The Anti-Catholic Roots of Liberal and Republican Conceptions of Freedom in English Political Thought*, 66 J. HIST. IDEAS 37, 43 (2005) ("throughout the seventeenth century it was widely believed that closet Catholics throughout the country formed a deadly fifth column lying in wait to slaughter Protestants and force their religion on the nation with Catholics"). In other words, each of these laws was justified—not by a risk of illegal activity in general—but based on a specific nexus to forceful, violent conduct in rebellion of the government. The government has offered no evidence that these laws apply to someone like Mr. Masters, who has no history of political violence or insurrection.

Each one of these regulations contained carve-outs to allow individuals to possess guns. As other courts have noted, anti-Catholic gun regulations nevertheless "allowed Catholics to obtain permission to possess firearms for self-defense" by going to a magistrate. *Calhoun*, 710 F.Supp.3d, at 590. The same was true for the few laws that prevented Native Americans from owning firearms. *See* 2 Records of the Colony of Rhode Island and Providence Plantations 561 (1857) (1677 R.I. law) (allowing Native Americans to possess firearms based on a "ticket or order" authorizing such possession). Even the laws governing the enslaved contained carveouts that authorized enslaved individuals to carry firearms under certain circumstances. And the laws disarming British loyalists were subject to the oath-taking exception, and individuals could acquire new arms without even taking the oath. Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America*, 25 L. & HIST. REV. 139, 157

(2007). So—to the extent that those historical laws could be framed as categorical exclusions based on danger—those exclusions were not absolute. Individualized exceptions were allowed despite some general prohibitions on firearm possession. That history indicates that as-applied challenges to § 922(g)(1) should be allowed to go forward.

In determining whether the government has proven that § 922(g)(1) is constitutional as applied to Mr. Masters, only Mr. Masters' felony convictions are relevant. Section 922(g)(1) purports to disarm Mr. Masters because he "has been convicted in any court of[] a crime punishable by imprisonment for a term exceeding one year[.]" 18 U.S.C. § 922(g)(1). If Mr. Masters' convictions do not demonstrate a history of conduct analogous to that which motivated colonial era gun regulations, and are not recent enough that the regulations would apply to the conduct, then § 922(g)(1) does not constitutionally apply to Mr. Masters.

Mr. Masters has sustained felony convictions. He has a burglary conviction from 2013 and several convictions for firearms possession. *See* page 2, *supra*. Those convictions, however, do not support permanent disarmament. For those individuals who were disarmed for political violence or forfeited their firearms for committing certain offenses, American history demonstrates that those disarmaments were not permanent. The founding-era governments allowed a felon to "'repurchase arms' after successfully completing his sentence and reintegrating into society." *Range*, 69 F.4th at 269 (Krause, J., concurring). Felons could serve in the militia, own firearms, and regain their ability to have their arms after being traitors to our nation. There is no historical tradition of

19

continuing to disarm individuals for the entirety of their lives without a contemporary adjudication of dangerousness.

Further, while Mr. Masters was on bond at the time of this arrest, this does not change the analysis. Mr. Masters seemingly presented no issues for 16 months on bond prior to this arrest. While the government can show a historical practice of temporarily banning individuals representing a credible threat to safety, *Rahimi*, 620 U.S. at 700, the government cannot show a historical practice of permanently banning non-violent felons. Therefore, even if his status as a person on bond can show a "credible threat" or abridge his constitutional rights, the ban on guns could only be temporary according to the historical analogues, rather than permanent as § 922(g)(1) requires.

The burden § 922(g)(1) imposes on those it regulates is therefore not comparable to the alleged historical analogues. Section 922(g)(1) is thus unconstitutional.

**CONCLUSION**

For the reasons stated above, the Court should find that Section 922(g)(1) is unconstitutional facially and as applied to Mr. Masters and grant his motion to dismiss the indictment against him.

Respectfully submitted,

FEDERAL DEFENDER PROGRAM
John F. Murphy
Executive Director

By:  /s/ *Daniel J. Hesler*
Daniel Hesler
*Attorney for Dakane Masters*

DANIEL HESLER
FEDERAL DEFENDER PROGRAM
55 E. Monroe Street, Suite 2800
Chicago, Illinois 60603
(312) 621-8347

## CERTIFICATE OF SERVICE

The undersigned, Daniel J. Hesler, an attorney with the Federal Defender Program hereby certifies that in accordance with FED. R.CIV.P5,LR5.5, and the General Order on Electronic Case Filing (ECF), the following documents(s):

**DEFENDANT MASTERS' MOTION TO DISMISS INDICTMENT
ON SECOND AMENDMENT GROUNDS**

Was served pursuant to the district court's ECF system as to ECF filing, if any, and were sent by first- class mail/ hand delivery on February 6, 2026, to counsel/ parties that are non-ECF filers.

By:    s/*Daniel J. Hesler*
        Daniel J. Hesler
        *Attorney for Dakane Masters*
        FEDERAL DEFENDER PROGRAM
        55 E. Monroe St., Suite 2800
        Chicago, Illinois 60603
        (312) 621-8347